IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TINA W.,[1] | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 20 C 6311 |
| v. | ) | |
| | ) | Magistrate Judge Gabriel A. Fuentes |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of Social Security,[2] | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**[3]

Before the Court is Plaintiff Tina W.'s motion for summary judgment seeking remand of the Administrative Law Judge's ("ALJ") opinion denying her application for Supplemental Security Income ("SSI") benefits and Disability Insurance Benefits ("DIB")[4] (D.E. 16) and the

---

[1] Plaintiff's surname has been omitted from this opinion in compliance with the Court's Internal Operating Procedure No. 22. The Court uses the pronouns she/her/hers to describe Plaintiff because she chose those pronouns in her opening brief. (D.E. 16.) Where the Court is unaware of a person's pronouns, the Court is using they/their/theirs to avoid inadvertent misgendering. *See* ABA Resolution 401 (2023) (supporting judicial implementation of N.Y. State Unified Court System's "bench card" outlining inclusive language practices "to foster an environment free of bias, prejudice, and harassment"); N.Y. Advisory Comm. on Judicial Ethics Op. 21-09 (2021) ("That is, "they" has been recognized as a grammatically correct use for an individual."), citing Merriam-Webster, *2019 Word of the Year: They* (available at https://www.merriam-webster.com/words-at-play/word-of-the-year-2019-they/they). All litigants before the magistrate judge are welcome to advise the courtroom deputy, at the outset of the litigation or at any time, of the pronouns they use. In the absence of an explicit notice, the magistrate judge will note pronouns used in briefs and other filings with the Court. The magistrate judge's pronouns are he/him/his.

[2] The Court substitutes Kilolo Kijakazi for the predecessor commissioner, Andrew Saul, as the proper defendant in this action pursuant to Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[3] On November 2, 2020, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was reassigned to this Court for all proceedings, including entry of final judgment. (D.E. 9.)

[4] The ALJ evaluated both Title XVI and Title II claims explaining that when the Plaintiff filed a valid title XVI (SSI) application, Plaintiff also filed a valid Title II (DIB) application. (R. 13, 35-36.)

Commissioner's cross motion for summary judgment to affirm that decision. (D.E. 21.)[5] Plaintiff filed her claim for benefits on February 22, 2018, alleging she has been disabled since May 5, 2015.[6] (R. 13, 202.)

I. ADMINISTRATIVE RECORD

Plaintiff was born on March 29, 1972, and was 45 on the date the application was filed. (R. 13, 26.) Plaintiff seeks benefits due to limitations stemming from cervical arthritis, fibromyalgia,[7] thyroid disease, celcemia, chronic fatigue syndrome, vertigo, lyme disease, PVD, inflammatory poly arthritis, neuropathy, migraines, muscle spasms, and severe anxiety since May 5, 2015. (R. 13, 202.)

A. Hearing

On December 4, 2019, Plaintiff, who was represented by counsel, testified at a hearing before an ALJ. (R. 33-75.) An impartial medical expert ("ME") and vocational expert ("VE") also testified at the hearing.

---

[5] The Appeals Council ("AC") subsequently denied review of the opinion (R. 1-6), making the ALJ's decision the final decision of the Commissioner. *Butler v. Kijakazi*, 4 F.4th 498, 500 (7th Cir. 2021).

[6] Plaintiff initially alleged that her disability began June 21, 2013, but at the hearing, Plaintiff's representative amended the onset date to May 6, 2016. (R. 13, 36.) Upon further review of the file, the ALJ determined that the Plaintiff's prior denials were finalized on May 4, 2015, and therefore considered Plaintiff's possible qualification for disability since May 5, 2015. (R. 13.)

[7] "Fibromyalgia is . . . characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues." https://www.mayoclinic.org/diseases-conditions/fibromyalgia/symptoms-causes/syc-20354780. Traditionally, doctors diagnosed fibromyalgia after checking how many of 18 specific points on a person's body were painful when pressed. https://www.mayoclinic.org/diseases-conditions/fibromyalgia/diagnosis-treatment/drc-20354785 (last visited June 8, 2023).

### 1. Plaintiff's Hearing Testimony

Plaintiff testified that she is currently not working, and that the last time she had a job was June of 2013. (R. 37.) Plaintiff lives in Fox Lake, Illinois, in a single-family home with her adult son and drove herself to the hearing in Evanston, Illinois. (R. 33, 38, 40.)

Plaintiff stated that she can walk 20 feet before feeling pain and 50 feet before the pain makes it impossible to continue walking. (R. 38-39.) The pain radiates from Plaintiff's feet, up her legs, to her lower back as well as down her neck and into her shoulders. (R. 39.) Plaintiff testified she can stand for five minutes. (*Id.*) Plaintiff also experiences pain when lifting, for instance, a gallon of milk, feeling the pain down her shoulders, back and legs. (R. 39-40.)

Plaintiff testified to spending 90 percent of the time in bed. (R. 41.) When not in bed, Plaintiff will eat one meal a day or use the bathroom. (*Id.*) Plaintiff does not do any household chores, as her son cleans the house. (*Id.*) Plaintiff grocery shops once every three weeks, limited to 20 minutes. (*Id.*) Plaintiff stated she has no social life – no one visits Plaintiff, she is seldom on a computer, she does not visit relatives or friends outside the home, and she does not participate in religious or recreational activities. (R. 41-42.) Finally, Plaintiff testified that the only medication she takes for pain is over-the-counter ibuprofen. (R. 42.)

At the conclusion of the Plaintiff's testimony and just prior to the ME's testimony, the ALJ stated that the ALJ was "not doing mental right now … because [the ME] is not going to deal with that." (R. 42.) After the ME was excused from the hearing, the ALJ questioned Plaintiff as to Plaintiff's mental health. (R. 56.) Plaintiff testified that she was not receiving any mental health treatment. (*Id.*) The ALJ briefly reviewed the record and noted that the consulting physicians and psychologists found Plaintiff's mood and anxiety issues were not severe and that depression

3

screening findings were negative. (R. 57.) Plaintiff's representative acknowledged that "there's no evidence. I mean she hasn't seen a psychiatrist or psychologist." (*Id.*)

### 2. Medical Expert's Testimony

At the hearing, ME, Sai Nimmagadda, M.D., testified that they understood Plaintiff's main impairment to be fibromyalgia or chronic pain syndrome with major physical impairments of neuropathy, mild/moderate degenerative disc disease of the lumbar spine, and thyroiditis or hypothyroidism. (R. 43, 361.) The ME reviewed the listings (mainly 14.09, 1.02, 1.04, and 11.14) and determined that Plaintiff did not meet or equal the listings as written. (*Id.*) Taking into account Plaintiff's chronic fibromyalgia pain-related symptoms and continued complaints of myalgia, the ME testified that Plaintiff's RFC was between a sedentary to light level. (*Id.*) The ME opined that Plaintiff could occasionally lift 20 pounds; frequently lift 10 pounds; stand and/or walk for two hours in an eight-hour day; sit for about six hours in an eight-hour day; frequently push and pull in both upper and lower extremities; occasional environmental and postural limitations, except never use ladders, ropes, and scaffolds; occasionally balance, stoop, kneel, and crouch; manipulative, visual, and communicative limitations as established; avoid wetness and vibration; and avoid commercial driving, dangerous moving machinery, unprotected heights, and moderate exposure. (R. 43-44.)

On cross-examination, the ME testified to having a specialty in allergy, immunology, and pulmonary medicine. (R. 45.) The ME reviewed the complete record and saw laboratory results regarding active inflammatory or immune-arthritis, saw a diagnosis of chronic fatigue syndrome that the ME described as "intermixable" or "all-encompassing" with myalgia and fibromyalgia. (*Id.*) The ME noticed sleep architectural impact or sleep disturbance in the file. (R. 48-49.) The ME made clear that the testimony was to "comment on the objective records." (R. 49.) The ME

saw radiculopathy in the file and noted that would be mild degenerative changes of the lumbar spine and enhanced the reduction to the two-hour stand-and-walk limit. (*Id.*) The ME also discussed Plaintiff's vertigo and saw evidence of dizziness but stated that the Romberg neurological findings were inconsistent with any neurological process of vertigo and the MRI of Plaintiff's brain was normal. (R. 50.)

### 3. Vocational Expert's Testimony

A vocational expert, Tobey Andre ("VE"), also testified at the hearing. (R. 54.) The VE testified that Plaintiff's past work included administrative assistant and shipping/receiving clerk. (R. 55-56, 60.) The ALJ presented the VE with a hypothetical 47-year-old with a high school education and skilled work background who could do sedentary work with frequent (up to two thirds of an eight-hour day) push and pull at the 10-pound level; occasionally (up to one third of an eight-hour work shift) balance, climb ramps and stairs, stoop, crouch, kneel, and crawl; kept off ladders, ropes, and scaffolds; and kept away from wetness and vibrations, dangerous moving machinery, and unprotected heights. (R. 63-64.) At first, the VE testified that the vast majority of unskilled sedentary positions take place in manufacturing or factories (near dangerous moving machinery) thus precluding this hypothetical work. (R. 64.) On further dialogue with the ALJ and reflection by the VE, the VE then testified that there were sedentary jobs in the nation that such a hypothetical individual could perform that were outside manufacturing such as order clerk, food and beverage with 150,000 jobs in the nation; ink printer with 173,000 jobs in the nation; and lens inserter of optical goods with 200,000 jobs in the nation. (R. 65-67.)

Upon questioning by Plaintiff's counsel, the VE testified that the internet has not eroded the job of order clerk, based on universities, hotels and restaurants. (R. 68.) Plaintiff's counsel also questioned the VE if the lens inserter position changed with shipping moving overseas, but

5

the VE testified that in their professional opinion, those jobs are still intact in the United States, although the numbers have decreased within the past 10 years. (R. 69.) The VE further testified that there would not be any jobs for an individual that missed three to four days of work per month. (R. 70-71.) Finally, if the ALJ's hypothetical were changed to occasional handling, fingering, reaching and pulling bilaterally, there would be no jobs available in the nation for such an individual. (R. 71-72.)

### B. ALJ Opinion

The ALJ applied the five-step inquiry required by the Social Security Act in reaching the decision to deny Plaintiff's request for benefits. At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since May 5, 2015, the day after Plaintiff's previous applications were denied. (R. 16.) At Step Two, the ALJ determined that Plaintiff suffered from the following severe impairments: fibromyalgia, lumbar spine spondylosis, right L5 radiculopathy, cervical spine degenerative disc disease, bilateral knee degenerative changes, vertigo, hypothyroidism and Hashimoto's disease. (*Id.*) The ALJ determined that Plaintiff's physical impairments of peripheral neuropathy, heart conditions, depression and anxiety were non-severe because there were no significant objective medical findings to support more than minimal limitations on Plaintiff's ability to perform work activities arising from these impairments. (*Id.*)

At Step Three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the Commissioner's listed impairments. (R. 18.) In support of this finding, the ALJ assessed the so-called "paragraph B criteria" and found that Plaintiff's impairments caused a mild limitation in understanding, remembering or applying information; a mild limitation in interacting with others; a mild limitation in concentrating,

persisting or maintaining pace; and a mild limitation in adapting or managing themselves. (R. 17-18.)

Before turning to Step Four, the ALJ determined that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work with the following exceptions:

> [Plaintiff] can frequently push and pull. [Plaintiff] can occasionally balance, climb ramps and stairs, stoop, crouch, kneel, and crawl. [Plaintiff] can never climb ladders, ropes, or scaffolds, or be exposed to wetness, vibrations, dangerous moving machinery, or unprotected heights.

(R. 20.) At Step Four, the ALJ noted that Plaintiff was unable to perform any past relevant work. (R. 25.) At Step Five, the ALJ concluded that a significant number of jobs existed in the national economy that Plaintiff could perform given her age, education, work experience and RFC, including the representative positions of order clerk (150,000 jobs in the nation), ink printer (170,000 jobs in the nation), and lens inserter (200,000 jobs in the nation). (R. 26-27.) As such, the ALJ found that Plaintiff had not been under a disability since May 6, 2016, the date of Plaintiff's amended onset date. (R. 27.)

## II.     LEGAL STANDARD

An ALJ's decision will be affirmed if it is supported by "substantial evidence," which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, – U.S. –, 139 S. Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. The Court "will not reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute our judgment for the ALJ's determination. Rather, this Court asks whether the ALJ's decision reflects an adequate logical bridge from the evidence to the conclusions." *Reynolds v. Kijakazi*, 25 F.4th 470, 473 (7th Cir. 2022) (citations and quotations omitted). The claimant has the burden of proof at Steps One through Four of the five-step sequential process for determining disability. *See Mandrell v.*

*Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022). At Step Five, the burden of proof shifts to the Commissioner of Social Security to show that the claimant can adjust to other work existing in "a significant number of jobs … in the national economy." *See Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

### III. ANALYSIS

Plaintiff argues for remand on the grounds that the ALJ: (1) failed to consider the non-exertional limitations arising out of Plaintiff's combined impairments, including finding the mental impairments non-severe, in crafting the RFC assessment; (2) failed to accommodate the Plaintiff's upper extremity limitations; (3) made an unsupported finding that Plaintiff's statements were not entirely consistent with the medical evidence; and (4) erred by failing to explain or support rejection of the opinion of Plaintiff's treating rheumatologist, Dr. Hozman. (D.E. 16: Pl. Mt. for S. Judg. at 7-15.) Because we find that the ALJ supported the RFC determination and credibility determination with substantial evidence, we affirm the decision.

#### A. The ALJ's Decision Not To Include Mental Limitations in Plaintiff's RFC Was Supported By Substantial Evidence.

The ALJ determined that Plaintiff's depression and anxiety are non-severe. (R. 17.) Plaintiff argues that the ALJ erred by omitting Plaintiff's non-severe mental restrictions from the RFC because ALJs must incorporate all limitations supported by the medical record, even those that are not severe, in assessing the individual's RFC; and that the ALJ did not even mention Plaintiff's mental impairments after Step Two. (Pl. Mot. for Sum. J. at 7.) However, the ALJ did examine the evidence of Plaintiff's mental impairments at length in the Paragraph B analysis (R. 17-18.) "A reviewing court is charged with reading an ALJ's opinion as a whole and taking a common-sense approach to its review." *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019), cited in *Brandi B. v. Kijakazi*, No. 21 C 4383, 2022 WL 2463558, at *6 (N.D. Ill. July 6, 2022).

8

In addition, contrary to Plaintiff's contention, the ALJ not only mentioned Plaintiff's mental impairments after Step Two but, in addressing Plaintiff's RFC, the ALJ discussed the October 3, 2018, opinion of state agency medical consultant Thomas Low, Ph.D. concluding Plaintiff's mental impairments were non-severe. (R. 24.)

### 1. Paragraph B Findings

The ALJ evaluated the Paragraph B findings and determined Plaintiff had mild limitations in all four functional areas. First, in understanding, remembering or applying information, the ALJ assessed a mild limitation. (R. 17.) The ALJ reasoned that although the Plaintiff alleged problems with understanding, remembering and following instructions in general and also needs reminders to take medicine and to go places (R. 17, 212-21), Plaintiff does not need special reminders to take care of her personal needs and grooming. (R. 17, 215.) Additionally, the ALJ noted that Plaintiff can drive a car, shop in stores and by computer, and manage money including paying bills and handling a savings account. (R. 17, 216.) The ALJ referenced a May 5, 2018, psychiatric consultative examination that found Plaintiff able to repeat three out of three words immediately, recall two out of three words after a five-minute delay and all three with cuing, name the current and past presidents, and perform calculations. (R. 17, 317.) Finally, the ALJ referenced that medical providers have documented Plaintiff as having normal memory. (R. 17, 287, 328, 374.)

Second, the ALJ determined Plaintiff had mild limitation in interacting with others. (R. 17.) The ALJ acknowledged that Plaintiff alleged problems getting along with others in general, and that Plaintiff gets easily irritated (R. 17, 218), but the ALJ noted that Plaintiff is able to live with family and talk to her parent on the phone weekly. (R. 17, 213, 217.) The ALJ also discussed that Plaintiff has been documented as pleasant and/or cooperative by medical examiners. (R. 17, 298, 316, 321, 350, 353, 354, 356.)

The ALJ also assessed Plaintiff with a mild limitation in concentrating, persisting or maintaining pace. (R. 18.) The ALJ noted that Plaintiff alleges problems with concentrating and completing tasks in general and that Plaintiff believes she can pay attention for only 10 minutes. (R. 18, 218.) But the ALJ described Plaintiff's ability to drive a car, shop in stores and by computer, and manage money including paying bills and handling a savings account. (R. 18, 216.) The ALJ also discussed that medical providers documented Plaintiff with normal attention (R. 18, 287, 328, 374) and at a May 5, 2018, psychiatric consultative examination, Plaintiff was able to complete mental status testing, including performing serial sevens. (R. 18, 317.)

Finally, in the area of adapting or managing oneself, the ALJ determined that Plaintiff had mild limitations. (R. 18.) The ALJ reasoned that although Plaintiff reports problems with handling stress and changes in routine in general (R. 18, 219), Plaintiff has been documented with appropriate mood and affect (R. 18, 304, 306, 439, 452, 455) and was fair or well-groomed. (R. 18, 316, 321.) The ALJ also noted that Plaintiff has not required specialized psychiatric treatment, frequent emergency room treatment, or inpatient treatment for her mental symptoms. (R. 18.)

### 2. State Agency Medical Consultant

Plaintiff argues that after a "boilerplate promise to conduct a more detailed assessment" of the paragraph B function criteria for purposes of determining RFC, the ALJ did not mention mental functioning again. (Pl. Mot. for Sum. J. at 9, citing R. 18.) Plaintiff is mistaken. Plaintiff briefly focused only on the psychiatric evaluation dated May 5, 2018 (R. 315-18) and ignored the findings of a state agency medical consultant, Dr. Low (R. 92-93), that the ALJ addressed in the RFC discussion.[8] (Pl. Mot. for Sum. J. at 9, R. 24.) In the context of the RFC finding, the ALJ provided

---

[8] Plaintiff correctly points out that the ALJ mentioned that Chirag Raval, M.D., who performed Plaintiff's psychiatric evaluation, thought Plaintiff looked uncomfortable sitting. (Pl. Mot. for Sum. J. at 9, citing R. 22, citing R. 316.) Plaintiff takes issue with the ALJ not mentioning that the examiner "observed" Plaintiff to have an anxious affect and anxious and worried mood. (*Id.*) But Plaintiff appears to

a sufficient discussion of relevant medical evidence, consisting of the state agency medical consultant's opinion regarding Plaintiff's non-severe mental impairments and noted the lack of mental health treatment. (R. 24.)

As part of the RFC analysis, the ALJ addressed Dr. Low's review of Plaintiff's file and the ALJ's finding that Plaintiff had mild limitations in all four of the so-called "paragraph B criteria." (R. 24, citing R. 92-93.) The ALJ found Dr. Low's conclusion that Plaintiff's mental impairments were non-severe persuasive, as that conclusion was consistent with and supported by the overall evidence of record, including Plaintiff's lack of mental health treatment, lack of mental status abnormalities at examinations, and typical documentation of Plaintiff as alert, oriented and cooperative, with appropriate mood and affect, and normal memory, attention, language, and fund of knowledge. (*Id.*, citing R. 282-96, 297-300, 301-14, 326-46, 350, 374, 430-59.) This reasoning and the lack of contrary evidence cited by the ALJ "provide adequate support for the ALJ's decision not to include non-exertional limitations in the RFC and the Court can follow the basis of the ALJ's reasoning." *Candice A.Z. v. Kijakazi*, No. 19 C 8174, 2021 WL 3187783, *6 (N.D. Ill. July 28, 2021) citing *Peeters v. Saul*, 975 F.3d 639, 641 (7th Cir. 2020) ("The court's role is not to reweigh evidence, but to determine whether the ALJ built an 'accurate and logical bridge' between the evidence and the conclusion.").

---

mischaracterize Plaintiff's own description of mood and affect into what the doctor observed: Dr. Raval's description does not include such observations, but rather states "Claimant describes … mood as 'I'm full of anxiety and worry.' Affect was 'anxious.'" (R. 316.) Plaintiff takes issue with the ALJ's failure to mention that Plaintiff's grooming at this evaluation was "only fair." (D.E. 16: Pl.'s Mt. for S. Judg. at 9-10, citing R. 22, citing R. 316.) However, the ALJ did mention this, albeit earlier in the decision. (R. 18, citing R. 316.) Plaintiff correctly points out that the ALJ did not mention that this examiner noted that Plaintiff struggled for a long time with anxiety, which got worse due to pain. (D.E. 16: Pl.'s Mt. for S. Judg. at 10, citing R. 317.) But as discussed below, Plaintiff has failed to provide any corroborating evidence.

Moreover, Plaintiff "has not pointed to any medical opinion or evidence to show any [mental impairments] caused any specific limitations." *Gedatus v. Saul*, 994 F.3d 893, 905 (7th Cir. 2021). In fact, at the hearing, Plaintiff's counsel agreed with the ALJ in discussing Plaintiff's mental health that "[y]eah, there's no evidence. I mean, she hasn't seen a psychiatrist or psychologist." (R. 57.) Plaintiff "bears the burden to prove she is disabled by producing medical evidence." *Gedatus*, 994 F.3d at 905 (internal citations omitted). In the absence of such evidence, the ALJ reasonably relied on the opinion of the state agency medical consultant in finding that Plaintiff had mild limitations in the Paragraph B criteria and such mental impairments were non-severe. *See Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021) (holding that ALJ's reliance on the state agency medical opinions was permissible where the claimant failed to present evidence of claimant's limitations).

### 3. Pain

Plaintiff next argues that the ALJ failed to consider the effects of Plaintiff's "constant and widespread" pain upon her ability to concentrate and complete tasks. (Pl. Mot. for Sum. J. at 10.) Plaintiff states that she is not arguing listing-level severity but insists that her dizziness, brain fog and pain affect her ability to concentrate in a full-time work setting. (*Id.*) However, Plaintiff only complained of brain fog once in April 2017 and, as discussed above, the ALJ observed that the examiners did not identify abnormal mental functioning. (R. 24, 286.) Once again, Plaintiff provides no corroborating evidence that dizziness and pain caused mental limitations. Furthermore, as discussed in greater detail below, the ALJ did not accept Plaintiff's complaints of dizziness and pain and found the opinion of the rheumatologist, Dr. Hozman, not persuasive because the doctor's extreme limitations for Plaintiff were not consistent with and supportable by the evidence in the record. (R. 24.)

Based on this record, the ALJ reasonably did not include any limitations for anxiety or depression in the RFC. A "finding of impairment at step two will not necessarily equate to any RFC limitation." *Candice A.Z.*, 2021 WL 3187783, at *7, quoting *Rick M. v. Saul*, 2021 WL 2588762, at *5 (N.D. Ill. June 24, 2021). Although an ALJ is required to consider limitations imposed by non-severe impairments at the RFC stage, the ALJ does not necessarily have to include them in the finding of plaintiff's RFC. *Id*. Here, the ALJ adequately considered Plaintiff's mild mental limitations but determined, with support of the state agency medical consultant and no contradictory evidence, that those limitations did not support a functional limitation in the RFC. Thus, the ALJ's decision that Plaintiff had mild mental impairments that did not require limitations in the RFC was supported by substantial evidence.

**B.  The ALJ Supported Plaintiff's Physical RFC with Substantial Evidence.**

Plaintiff contends that despite the persistent numbness and pain in her bilateral upper extremities (the arms), the ALJ did not address any limitations arising out of these symptoms in the RFC assessment. The Commissioner argues that the ALJ reviewed the physical examination findings and considered them in full. Plaintiff, in essence, is inviting us to reweigh the evidence, something this Court will not do. *Reynolds*, 25 F.4th at 473.

In assessing Plaintiff's RFC, the ALJ thoroughly considered Plaintiff's physical examination findings. (R. 21-22.) In particular, the ALJ discussed findings of lost sensation in Plaintiff's limbs, noting some abnormalities such as generalized decreased sensation and also patchy, nondermatomal and inconsistent sensory loss in Plaintiff's limbs. (R. 21 citing 287, 329, 374.) The ALJ also noted Dr. Hozman's findings of a slightly reduced grip strength (4/5), knee crepitus, pain with shoulder abduction, and tenderness in the shoulders and trigger points. (R. 21-22 citing 304, 306, 439, 452, 455.) Importantly, and by example, the ALJ also compared these

findings to other physical examination findings that typically demonstrated that Plaintiff was comfortable or in no distress, with full strength and tone throughout (5/5); intact cranial nerves, balance and coordination; normal gait; and no sensory deficits to vibration, position, light touch or pinprick. (R. 22 citing 287, 299, 304, 306, 321-23, 328-29, 374, 439, 455.)

The ALJ also assessed internal medicine consultative evaluator Debbie L. Weiss, M.D.'s observations that, despite having a positive Tinel's sign at both arms, Plaintiff had full grip strength (5/5) and no difficulty using her hands for fine or gross manipulation. (R. 22 citing 322-23.) The ALJ also observed that the Plaintiff had not sought treatment since November 2018, more than one year prior to the hearing. (R. 24.)

Plaintiff emphasizes her own complaints related to general numbness and pain, including her diagnosis of fibromyalgia, examination findings such as reduced grip strength and loss of sensation, and Dr. Hozman's opinion that Plaintiff had a limited ability to use her hands (Pl. Mot. for Sum. J. at 12), but Plaintiff did not discuss that the ALJ weighed this evidence with the other evidence outlined above, such as normal grip strength and no difficulty using Plaintiff's hands in the ALJ's consideration of Plaintiff's RFC. The Court finds that the ALJ properly rejected Dr. Hozman's opinion, discussed in greater detail below, and that the ALJ explained why Plaintiff's subjective complaints were not accepted. (R. 23-24.) The Court declines Plaintiff's invitation to reweigh the evidence and finds that Plaintiff's physical RFC is supported by substantial evidence.

### C. The ALJ Properly Evaluated Plaintiff's Subjective Symptoms.

The ALJ found Plaintiff's statements about the intensity, persistence and limiting effects of the symptoms from her impairments "not entirely consistent with the medical evidence and other evidence in the record." (R. 23.) The Court will overturn an ALJ's credibility determination only if it is "patently wrong." *Wilder v. Kijakazi*, 22 F.4th 644, 653 (7th Cir. 2022). In determining

14

credibility, ALJs shall consider factors including "objective medical evidence of the claimant's impairments and treatment," "a claimant's treatment history," *Deborah M. v. Saul*, 994 F.3d 785, 789-90 (7th Cir. 2021), and "any inconsistencies between the allegations and the record." *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020).

Plaintiff relies on three points in arguing that the ALJ's finding that Plaintiff's statements are not entirely consistent with the medical evidence was unsupported and that the ALJ "cherry pick[ed]" pieces of evidence. (Pl. Mot. for Sum. J. at 13.) First, Plaintiff argues that mere management of symptoms does not mean that the symptoms have disappeared. (*Id.*) Second, Plaintiff claims that non-compliance with providers' recommendations (physical therapy and regular exercise) was consistent with Plaintiff's symptoms because staying in bed most of the day is consistent with symptoms of depression and chronic, intractable pain. (*Id.* at 13-14.) Finally, Plaintiff states that the ALJ's summation of the medical record, to the effect that Plaintiff was not typically documented to be in distress by examiners, was misleading. Plaintiff admits not having been in "complete" distress but points to purportedly significant abnormal findings to suggest that "distress would be forthcoming" and that an individual need not be completely incapacitated to be eligible for disability benefits. (*Id.* at 14.)

"As long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn a credibility determination unless it is patently wrong." *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022). Here, the ALJ considered Plaintiff's allegation that about spending 90 percent of the day in bed (R. 23, 214, 316, 327), but the ALJ also described evidence in the record of normal examination findings, failure to pursue recommended treatment, and activities of daily living. (R. 23.) The ALJ appropriately considered Plaintiff's treatment history and observed that Plaintiff had not treated with Dr. Hozman since November 2018 (R. 24) and submitted no evidence

15

of any treatment since that date. The ALJ further recognized Plaintiff's testimony that she took only over-the-counter Ibuprofen (R. 42) and surmised: "it is puzzling that a person who suffers from the extreme level of pain that she does would be content to be only taking over the counter Ibuprofin [sic]." (R. 25.) *See Deborah M.*, 994 F.3d at 790, citing *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (affirming an adverse credibility finding based on plaintiff's "relatively conservative" treatment consisting of "various pain medications, several injections, and one physical therapy session"); *Prill v. Kijakazi*, 23 F.4th 738, 749 (7th Cir. 2022) (finding the ALJ properly considered that the plaintiff received "conservative treatment").

The ALJ also discussed that Plaintiff's providers recommended physical therapy and exercise to combat the effects of fibromyalgia, and that Plaintiff did not comply. (R. 23, 304, 438, 455.) Plaintiff, on the other hand, argued in a circular fashion that she could not comply with such treatment because she was bedridden; but Plaintiff pointed to no evidence of having needed to stay in bed. Further, Plaintiff was noncompliant with Dr. Hozman's treatment note to follow-up with a pain management specialist to undergo a nerve block. (R. 23, 451-52.) Failure to comply with prescribed therapy is also a proper ground upon which to discount Plaintiff's claims. *See Kaplarevic v. Saul*, 3 F.4th 940, 943 (7th Cir. 2021). Although Plaintiff told Dr. Hozman that Plaintiff's vertigo was constant in June 2018 (R. 454), the ALJ recognized that Plaintiff's examiners documented no deficits in gait, coordination or balance. (R. 23, 374, 452, 455.) The ALJ also recognized that Plaintiff's testimony about spending all day in bed was inconsistent with the physical examination findings that Plaintiff appeared in no distress and with normal strength and no atrophy. (R. 23, 287, 299, 304, 306, 321-23, 328, 374, 455.)

Plaintiff argues that had she been in a treatment room longer or placed in a competitive work environment, her distress would be "forthcoming." (Pl. Mot. for Sum. J. at 14.) But as the

ALJ pointed out, Plaintiff's examiners did not document her being in distress. (R. 23, 286-88, 302-04, 305-14, 321, 328-29, 373-75, 438-39, 451-52, 454-55.) Finally, the ALJ reasoned that Plaintiff's ongoing ability to drive, and particularly for long distances, was inconsistent with Plaintiff's allegation of severe vertigo. (R. 23, 25, 454.)[9] And the ALJ was further perplexed that Plaintiff's treating physicians never advised to stop driving despite such alleged severe vertigo spells. (R. 25.)

Thus, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff's statements were not entirely consistent with the medical evidence. Plaintiff's arguments amount to no more than a disagreement with the way the ALJ weighed the evidence, which is not an appropriate basis for remand. *Poole v. Kijakazi*, 28 F.4th 792, 796 (7th Cir. 2022).

### D. The ALJ's Assessment of Dr. Hozman's Opinion Was Supported By Substantial Evidence.

Finally, Plaintiff argues that the ALJ failed to explain or support the ALJ's rejection of the opinion of Plaintiff's treating rheumatologist, Dr. Hozman. Dr. Hozman's opinion is not entitled to deference. For claims filed after March 27, 2017, such as this one, the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) ... including those from [the plaintiff's] medical sources." 20 C.F.R. § 416.920c(a). "The most important factors" to consider in evaluating the persuasiveness of a medical source's opinion are "supportability" (in the medical source's explanations and medical evidence) and "consistency" (with the evidence from other medical and nonmedical sources in the record), and ALJs must explain how they considered these factors. *Id.* at § 416.920c(b)(2) and (c). ALJs "may, but [are]

---

[9] Plaintiff testified to having driven from home in Fox Lake, Illinois, to Evanston, Illinois, for the hearing before the ALJ, a round trip of about 100 miles. (R. 25, 38.)

17

not required to" explain how they considered a medical source's specialization or relationship with a claimant. *Id.*

In Dr. Hozman's medical assessment form, the doctor described Plaintiff's prognosis as "poor" with "severe" chronic pain/paresthesia. (R. 758.) Dr. Hozman thought Plaintiff's symptoms would "constantly" interfere with the attention and concentration needed to perform even simple work tasks during a typical workday. (R. 759.) The doctor also thought Plaintiff's medications could cause drowsiness, which may have implications for working. (*Id.*) Dr. Hozman opined that Plaintiff could walk for two blocks without rest or severe pain; could continuously sit for 15 minutes; could continuously stand for 10 to 20 minutes; and could sit, stand and walk for less than two hours total in an eight-hour workday. (R. 759-60.) Dr. Hozman also thought Plaintiff would need more than 10 unscheduled breaks to rest, lasting 20 minutes each, during an eight-hour workday. (R. 760.) Dr. Hozman opined that Plaintiff could rarely twist and stoop, could only grasp/turn/twist objects with her hands for 25 percent of a workday, do fine manipulation with her fingers for 25 percent of a workday, and use her arms for reaching for 25 percent of a workday. (R. 761.) The doctor also thought Plaintiff would be absent from work four or more days a month. (*Id.*)

Here, the ALJ provided detailed evidentiary support for determining that Dr. Hozman's opinion was not persuasive because the doctor's extreme limitations were not consistent with and supportable by the overall evidence of record. (R. 24.) Plaintiff argues that Dr. Hozman's own treatment notes support the doctor's opinion and that a neurologist's treatment notes corroborate the doctor's findings and opinion. (Pl. Mot. for Sum. J. at 15.) But the ALJ explained that while Plaintiff had some examination abnormalities and abnormalities on objective testing, Plaintiff was typically found to have normal (5/5) muscle strength and tone, normal musculoskeletal range of

motion, intact cranial nerves, intact balance and coordination, and normal gait. (R. 24, 287, 298-99, 302-14, 327-46, 347-360, 374, 439, 452, 455.) The ALJ pointed out that Dr. Hozman failed to reference objective evidence in support of specific limitations. (R. 24.) In addition, as the ALJ explained, and as Plaintiff acknowledged, Dr. Hozman had not examined Plaintiff for more than a year prior to the completion of the doctor's questionnaire. (R. 24; Pl. Mot. for Sum. J. at 14.)

The ALJ also supported the decision by finding that the opinion of the ME, Dr. Nimmagadda, was persuasive because the ME is an impartial medical expert and reviewed the medical record. (R. 24-25.) The ALJ explained that the ME's opinion was consistent with and supportable by the record, due to the frequent normal findings as compared to abnormal findings. (R. 25.) Once again, Plaintiff in effect requests that the Court reweigh the opinions of Dr. Hozman and the ME. But the Court cannot do so. *Reynolds*, 25 F.4th at 473.

## CONCLUSION

For the foregoing reasons, the Court grants Defendant's motion for summary judgment (D.E. 21) and denies Plaintiff's motion for summary judgment. (D.E. 16.)

ENTER:

_____
**GABRIEL A. FUENTES**
**United States Magistrate Judge**

**DATED: June 16, 2023**